JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, James Blackwell ("Appellant"), appeals from his convictions for drug trafficking, possession of drugs, and possession of criminal tools. For the reasons set forth below, we affirm.
 {¶ 2} On December 20, 2004, the Cuyahoga County Grand Jury indicted Appellant on five counts: one count of drug trafficking, in violation of R.C. 2925.03(A)(1), with a one-year firearm specification, in Count One; one count of drug trafficking, in violation of R.C. 2925.03(A)(2), with a one-year firearm specification, in Count Two; one count of possession of drugs, in violation of R.C. 2925.11, with a one-year firearm specification, in Count Three; one count of possession of drugs, in violation of R.C. 2925.11, in Count Four; and one count of possessing criminal tools, in violation of R.C. 2923.24, in Count Seven. Appellant pleaded not guilty to all charges in the indictment.
 {¶ 3} The jury trial of this matter commenced on October 12, 2005. At trial, the State presented the testimony of the following witnesses: Detective Jeff Hirko ("Hirko"), Anthony Turner ("Turner"), Deputy Sheriff David Jacobs ("Jacobs"), Detective Clifford Pinkney ("Pinkney") and Detective Sergeant Miguel Caraballo ("Caraballo").
 {¶ 4} The testimony of the aforementioned individuals revealed the following facts. On December 3, 2003, Hirko and Caraballo interviewed an informant who stated that he could make a controlled purchase of narcotics from a male he knew as "Plumb." The detectives conducted an investigation that identified "Plumb" as one Anthony Turner.
 {¶ 5} On December 5, 2003, the detectives met the informant at the Cuyahoga County Sheriff's Department where they searched the informant and his vehicle to insure that the informant did not have any drugs. Thereafter, the detectives wired the informant with a small transmitter and recording device. Next, the detectives provided the informant with money that had been photocopied and whose serial numbers had been recorded. The detectives then assigned Detectives McKissick, Jacobs, Pinkney, and Ford, to conduct surveillance at Turner's residence.
 {¶ 6} After the detectives set up the surveillance, Hirko and Caraballo witnessed the informant place a call to Turner's pager. Approximately 15 minutes later, Turner returned the informant's page. The informant told Turner he wished to purchase two and a quarter ounces of crack cocaine. Turner instructed the informant to meet him on the corner of East 132nd Street and Abell Avenue to make the drug transaction. The detectives followed the informant to this area and maintained constant audio and visual surveillance of the informant and his vehicle.
 {¶ 7} Upon arrival at the intersection, the detectives observed Turner approach the informant's vehicle and sit in the front passenger seat. Turner had only a half ounce of crack cocaine to sell to the informant at that time and did not have the two and a quarter ounces that had been previously arranged. Turner told the informant that he could buy the half ounce now or could wait and get the full amount in about 20 minutes. The informant told Turner that he would wait for the full two and a quarter ounces of crack cocaine. At that time, no controlled purchase took place.
 {¶ 8} Turner then exited the vehicle. Detectives Jacobs, McKissick, Pinkney and Ford were informed of the failed drug purchase and were instructed to continue their surveillance of Turner. Jacobs and McKissick positioned themselves directly across the street from Turner's side entrance. Pinkney and Ford were assigned to drive around the streets near Turner's residence in order to keep a moving surveillance upon the suspect.
 {¶ 9} After the failed drug purchase, Jacobs and McKissick witnessed Turner return to his residence. Turner then telephoned Appellant to obtain the two and a quarter ounces of crack cocaine. Appellant told Turner that he would come to Turner's residence with the crack cocaine shortly.
 {¶ 10} When Turner returned home, the informant returned to the prearranged meeting area designated by the detectives. Hirko and Caraballo remained with the informant while the other detectives participated in the surveillance of Turner.
 {¶ 11} Approximately 15 minutes after Turner returned home Detectives Jacobs and McKissick witnessed Appellant enter Turner's residence. Turner testified that upon Appellant's arrival, the two went into his basement and weighed the crack cocaine. Turner then telephoned the informant.
 {¶ 12} During the telephone conversation, Turner instructed the informant to return to East 132nd Street and Abell Avenue and wait for Turner's arrival. The purpose of the visit was to purchase two and a quarter ounces of crack cocaine. After receiving this call, the detectives followed the informant to the intersection and maintained constant audio and visual surveillance as they had the first time.
 {¶ 13} As the informant waited for Turner's arrival, he received another telephone call from Turner and was instructed to change his location to East 132nd Street and Byron Avenue. The informant complied with Turner's request, turned his vehicle around, and proceeded to the corner of Byron and East 132nd Street. Detectives Hirko and Caraballo followed the informant and positioned themselves just west of his location in a driveway.
 {¶ 14} Additionally, Caraballo informed Jacobs, McKissick, Pinkney and Ford via radio of the substance of the telephone call with Turner. Within minutes of that transmission, Jacobs and McKissick witnessed Turner and Appellant exit Turner's residence and enter Appellant's vehicle. The vehicle headed westbound on Abell Avenue.
 {¶ 15} Appellant drove Turner, in his girlfriend's maroon Lexus, to the scene. More specifically, Appellant drove southbound on East 132nd Street, passed Detectives Hirko and Caraballo, turned around in a driveway, passed the detectives again and let Turner off just north of the detectives' location.
 {¶ 16} Turner then walked directly to the informant's vehicle. He entered the vehicle on the passenger side and sat in the front seat. After dropping Turner off, Appellant pulled to the side of the road and parked.
 {¶ 17} Once Turner was in the informant's vehicle, the detectives monitored the conversation between the informant and Turner. The detectives listened as the controlled purchase took place. Thereafter, the detectives moved in to arrest the passengers in both the informant's and Appellant's vehicles.
 {¶ 18} Upon arriving at the informant's vehicle, Hirko observed Turner with suspected crack cocaine in his right hand and money in his left hand. At that time, Hirko identified himself and ordered Turner out of the vehicle. When Turner exited, the two and a quarter ounces of crack cocaine fell out of the vehicle onto the street and the money fell onto the floor boards of the vehicle.
 {¶ 19} Hirko then identified himself again, immediately took Turner into custody, and asked if Turner had any weapons on him. Turner stated that he had a gun in his pocket. Hirko retrieved the weapon, a fully loaded Glock .40 from his pocket, and conducted a pat-down of Turner. The pat-down revealed a small amount of crack cocaine in Turner's pocket. After arresting Turner, the detectives placed him in the back of an undercover police vehicle.
 {¶ 20} The detectives also stopped the Appellant's vehicle. Captain Bartko and Detectives Cipollone, Bucci and Shannon assisted in stopping that vehicle. Once stopped, the Appellant and Lee Whitfield, a passenger in the vehicle, were detained until Caraballo could arrive and conduct an interview.
 {¶ 21} After questioning Appellant and Whitfield, the detectives placed the two in the police vehicle with Turner. This vehicle was equipped with video and audio listening devices.
 {¶ 22} The tape retrieved from the police vehicle was entered into evidence at the trial of this matter. The tape revealed Caraballo reading Turner his rights and attempting to recruit him as an agent of the police by turning over Appellant and Whitfield. Turner refused Caraballo's request twice and declined to offer him information regarding Appellant or Whitfield. The tape further revealed the conversation between the three men when they were alone in the vehicle together. During that time, Appellant told Turner "just to say he didn't know anything." Appellant also told Turner to tell the police that Appellant was never at Turner's house. Additionally, the tape reveals Appellant telling the police that he never went to Turner's home.
 {¶ 23} Caraballo interviewed each of the suspects separately. When Turner was interviewed, only then did he inform Caraballo that Appellant was his supplier and begged the detective not to tell Appellant because he feared for his life.
 {¶ 24} After the arrest of the men, the detectives searched Turner's residence and discovered crack cocaine, a scale, a shotgun and ammunition. Additionally, Hirko searched the Lexus for additional money, weapons, drugs or contraband. In the trunk, the detectives discovered a scale, a measuring cup, and a baster with suspected cocaine residue. Realizing that these items are typically used to manufacture crack cocaine, Detectives Hirko and Caraballo submitted the items to the Bureau of Criminal Investigation for testing of the residue on these objects, which was confirmed to be cocaine.
 {¶ 25} At the conclusion of the State's case Appellant moved, pursuant to Crim.R. 29, for acquittal. The trial court denied Appellant's motion as to Counts One, Two, Three, Four and Seven. The court, however, granted Appellant's motion with regard to the firearm specifications contained within Counts One, Two and Three. The defense then rested its case.
 {¶ 26} On October 17, 2005, the jury found Appellant guilty of one count of drug trafficking as charged in Count Two, one count of possession of drugs as charged in Count Four and one count of possessing criminal tools as charged in Count Seven. The jury found Appellant not guilty of drug trafficking as charged in Count One and drug possession as charged in Count Three. Appellant moved for a judgment notwithstanding the verdict, which the trial court denied.
 {¶ 27} The court then proceeded to sentencing and imposed upon Appellant a three-year term of incarceration for Count Two and six months for Counts Four and Seven, to be served concurrently.
 {¶ 28} Appellant now appeals his convictions and submits three assignments of error for our review.
 {¶ 29} Appellant's first assignment of error states:
 {¶ 30} "The trial court erred admitting into evidence a taped conversation between the co-defendants while under arrest inside the police vehicle."
 {¶ 31} Within this assignment of error, Appellant maintains that his Fifth and Sixth Amendment rights were violated because the conversation he had with Turner in the back seat of the police cruiser was taped and admitted into evidence at the trial of this matter. More specifically, Appellant asserts that Turner acted as an agent of the State and was placed in the vehicle with Appellant in order to extract incriminating information from Appellant. We find Appellant's argument unpersuasive.
 {¶ 32} First, Appellant has not directed this court, nor have we found anything in the record that indicates that Turner was acting as an agent of the State when he and Appellant conversed in the back of the police cruiser. Contrastingly, the testimony of the detectives and Turner reveals that Turner declined the detectives' offers to become an agent prior to the recorded conversation. It was not until after Turner was taken from the police vehicle and the conversation was recorded that Turner offered his statement against Appellant. Accordingly, Appellant's assertion that Turner was an agent of the State is without merit.
 {¶ 33} Second, Appellant did not have a reasonable expectation of privacy in the back seat of a police cruiser. InUnited States v. Clark (C.A.8, 1994), 22 F.3d 799, the court stated:
 {¶ 34} "A person does not have a reasonable or legitimate expectation of privacy in statements made to a companion while seated in a police car. * * * A marked police car is owned and operated by the state for the express purpose of ferreting out crime. It is essentially the trooper's office, and is frequently used as a temporary jail for housing and transporting arrestees and suspects. The general public has no reason to frequent the back seat of a patrol car, or to believe that it is a sanctuary for private discussions. A police car is not the kind of public place, like a phone booth, where a person should be able to reasonably expect that his conversation will not be monitored. In other words, allowing police to record statements made by individuals seated inside a patrol car does not intrude upon privacy and freedom to such an extent that it could be regarded as inconsistent with the aims of a free and open society." Id. at 801-802 (citations omitted); see, also, State v. Jones (Mar. 2, 2000), Cuyahoga App. No. 75843; State v. Skidmore (Aug. 7, 2000), Warren App. No. CA99-12-137; State v. Wynter (Mar. 13, 1998), Miami App. No. 97 CA 36.
 {¶ 35} In this instance, Appellant, while in the police vehicle with Turner and Whitfield, could not reasonably have expected his conversations would be private. Therefore, we find that the trial court did not err in allowing the taped conversation into evidence. Appellant's first assignment of error is without merit.
 {¶ 36} Appellant's second assignment of error states:
 {¶ 37} "The trial court erred by not allowing counsel to cross-examine the testifying co-defendant regarding possible potential penalties in the present case and co-defendant's previous drug convictions."
 {¶ 38} In this assignment of error, Appellant maintains that the trial court abused its discretion in disallowing defense counsel to inquire during cross-examination into the possible maximum incarceration of co-defendant, Turner, in this case and the penalties incurred as a result of previous convictions. A review of the transcript reveals that defense counsel was permitted to question Turner as to the term of incarceration he might possibly serve as a result of this case. More specifically, the following occurred during the defense counsel's cross-examination of Turner:
 {¶ 39} "Q: You had a discussion with the detectives, correct?
 {¶ 40} "A: Yes.
 {¶ 41} "Q. They talked to you about hard time?
 {¶ 42} "A: Yes.
 {¶ 43} "Q: Correct?
 {¶ 44} "A: Yes.
 {¶ 45} "Q: Were they talking in years? What were they talking?
 {¶ 46} "A: Well, I think I recall 3 to 10. Ten years. Something like that. I guess it started going through my mind. I can remember 3 to 10.
 {¶ 47} "* * *
 {¶ 48} "Q: You rather do the 3 then, wouldn't you, rather do 3 than 10?
 {¶ 49} "A: Yes, if that's what it comes to, yeah."
 {¶ 50} Although we have determined that the trial court permitted defense counsel to cross-examine Turner regarding his potential penalties, had the trial court refused to allow this cross-examination, we nevertheless would not find an abuse of discretion.
 {¶ 51} In State v. Gresham, Cuyahoga App. No. 81250, 2003-Ohio-744, this court held that a defendant does not have a right to cross-examine witnesses as to the potential penalty that could be imposed as a result of a plea bargain. In so holding, the court reasoned that "[t]he fact that the witnesses agreed to plead guilty to lesser charges and to testify against appellant is sufficient to demonstrate the witness' potential motive to misrepresent the facts. A comparison of the potential penalties under the plea agreement versus the original charges does not add to this demonstration." Id.
 {¶ 52} The court in Gresham, supra, further found that the probative value of testimony concerning the potential penalty is substantially outweighed by the danger of unfair prejudice. Id. The court reasoned that the potential penalties the witness could face were the same as those pending against defendant in that case. Id. Any possibility that the jurors might then improperly consider the potential sentence when rendering its verdict against the defendant outweighs the probative value of assessing the witness' motivation to misrepresent the facts. Id.
 {¶ 53} As in Gresham, we find that the trial court would not have erred had it denied Appellant's request to question Turner as to the possible penalty he would receive as a result of a plea bargain. For the same reasons, we find that the trial court did not err in refusing to allow Appellant to cross-examine Turner as to the potential penalties he faced in his prior drug convictions. The trial court correctly decided that the probative value of introducing such testimony was substantially outweighed by the danger of unfair prejudice. Accordingly, Appellant's second assignment of error is without merit.
 {¶ 54} Appellant's third assignment of error states:
 {¶ 55} "The verdict to drug trafficking (prepare for shipment) was inconsistent with the evidence."
 {¶ 56} Within this assignment of error, Appellant maintains that the jury was confused in finding him guilty of drug trafficking as charged in Count Two because he was found not guilty of drug trafficking as charged in Count One and not guilty of drug possession as charged in Count Three. We find Appellant's argument without merit.
 {¶ 57} While Appellant certainly could have been found guilty of all these charges under the facts of this case, that he was found not guilty of some of them does not render the verdicts incompatible. In Browning v. State (1929), 120 Ohio St. 62,165 N.E. 566, at paragraph four of the syllabus, the Ohio Supreme Court stated relevant to this very issue: "[t]he several counts of an indictment containing more than one count are not interdependent. A verdict responding to a designated count will be construed in the light of the count designated, and no other. An inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count." See, also, State v.McNicol (1944), 143 Ohio St. 39, 53 N.E.2d 808. As the Ohio Supreme Court stated in McNicol, "[t]he fact that [defendant] was found not guilty on the other two counts in the indictment is immaterial." Id. at 47. Accordingly, Appellant's convictions are upheld and his third assignment of error is without merit.
Judgment affirmed.
It is ordered that appellee recover from appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Cooney, J., and McMonagle, J., concur.